IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 3:11-2129-CMC |
| | ) | |
| v. | ) | OPINION AND ORDER |
| | ) | (FORFEITURE) |
| DWAYNE LEMONT BUDDEN | ) | |
| _____ | ) | |

This matter is before the court on motion of the United States ("Government") for judgment and an order of forfeiture in the amount of $2,209,628.30.[1] Defendant Dwayne Lemont Budden ("Budden") opposes the motion, arguing that the amount forfeited should be limited to $13,245.48, the amount his company, Budden Company, LLC, netted as a result of its use of the mail. For the reasons set forth below, the court rejects Budden's argument and orders forfeiture in the amount sought by the Government.

**BACKGROUND**

Budden pled guilty to Count 2 of a three-count Superceding Indictment. Dkt. No. 35. Count 2 charged Budden with Mail Fraud in violation of 18 U.S.C. § 1341 and incorporated various paragraphs from Count 1. Collectively, Count 2 and the incorporated paragraphs from Count 1 read as follows:

COUNT 1

THE GRAND JURY CHARGES:

\* \* \*

2.   DWAYNE LEMONT BUDDEN and HAZEL BUDDEN were residents of Sumter, South Carolina, who owned and operated Budden Company, LLC.

---

[1] The indictment sought forfeiture of "a minimum of $2,425,716[.]" At sentencing, the Government reduced the amount sought to $2,409,628 based on a determination that $254,420 paid for bone removal was not subject to forfeiture.

3.      The Budden Company contracted with Pilgrim's Pride, a chicken processor, and its predecessor, GoldKist, to remove waste from the Sumter, South Carolina facility. The contract required processing waste to be disposed of by DWAYNE LEMONT BUDDEN and HAZEL BUDDEN at the Lee County Landfill.

4.      Rather than dispose of waste at the Lee County Landfill, DWAYNE LEMONT BUDDEN and HAZEL BUDDEN transported chicken offal and other by-products of the GoldKist/Pilgrim's Pride facility to purported family property in Pinewood, South Carolina, where it was disposed of without a permit. The Pinewood property was approximately seventeen acres in size.

5.      Subsequent to this unauthorized disposal, DWAYNE LEMONT BUDDEN and HAZEL BUDDEN submitted forged Lee County Landfill tickets for reimbursement to both GoldKist and Pilgrim's Pride.

6.      The Pilgrim's Pride invoices were mailed to Pittsburg, Texas, by DWAYNE LEMONT BUDDEN and HAZEL BUDDEN for payment.

7.      From 2002 through 2007, Lee County Landfill records indicate fees charged to DWAYNE LEMONT BUDDEN and HAZEL BUDDEN of less than $10,000.

8.      Receipts submitted to GoldKist/Pilgrim's Pride by DWAYNE LEMONT BUDDEN and HAZEL BUDDEN for the same activity during the same period total approximately $2,425,715.66.

* * *

COUNT 2

THE GRAND JURY FURTHER CHARGES:

1.      Paragraphs 2 though 8 of Count 1 of this Indictment are incorporated herein as setting forth a scheme and artifice to defraud;

2.      On or about March 12, 2007, in the District of South Carolina and elsewhere, the Defendants, DWAYNE LEMONT BUDDEN and HAZEL BUDDEN, for the purpose of executing and attempting to execute the scheme and artifice to defraud did place in a post office and authorized depository for mail matter, matter and things to be sent and delivered by the United States Postal Service (USPS), and did deposit and cause to be deposited matter and things to be sent and delivered by private and commercial interstate carriers, and did take and receive therefrom such matter and things and did knowingly cause to be delivered by mail and such carrier according to the direction thereon, and at the place at which such matter and things were

addressed, in that they submitted invoice #3 by mail to Pilgrim's Pride for reimbursement, knowing that they were not entitled to be paid for falsified landfill tickets;

All in violation of Title 18, United States Code, Section 1341.

Dkt. No. 35 at 3-4.

Budden's Amended Plea Agreement states that the Government would have to prove the following to sustain its burden of proof as to this offense:

On or about March 12, 2007, in the District of South Carolina,

ONE: The defendant knowingly devised or knowingly participated in a scheme or artifice to defraud or to obtain money or property by means of false or fraudulent pretenses, representations, or promises as detailed in the superceding indictment; and

TWO: In advancing, or furthering, or carrying out this scheme to defraud or to obtain property by means of false or fraudulent pretenses, representations, or promises, the defendant used the mails or caused the mails to be used; and

THREE: The defendant acted with intent to defraud.

Dkt. No. 51 at 1-3.

## DISCUSSION

**Budden's Argument.** Budden argues that the amount of the forfeiture should be limited to the amount he received from Pilgrim's Pride in response to mailed invoices, only one of which was paid. This argument rests on the dual premises that (1) because Pilgrim's Pride was a different entity from GoldKist, the fraud perpetuated against GoldKist could not have been part of the same scheme as the fraud against Pilgrim's Pride, and (2) because the mail was not used to send invoices to or receive payment from GoldKist, the fraud against GoldKist did not violate 18 U.S.C. § 1341. *See* Dkt. No. 76 at 1 (noting "Pilgrim's Pride purchased the Sumter County processing plant from [GoldKist] sometime in December 2006 and took over operations in early 2007. Prior to 2007, all

3

Budden Company invoices were hand delivered to [GoldKist] and all payments made to Budden Company from [GoldKist] were also hand delivered."). Budden argues that "[t]he two mailings charged in the indictment did not and could not have furthered the scheme to defraud [GoldKist]" because any scheme to defraud GoldKist "had been completed by October 31, 2006, the date of the last payment to the Budden Company by [GoldKist.]" Dkt. No. 76 at 1-2.

**Effect of Budden's Guilty Plea.** The court will assume without deciding that Budden's argument is one that he could have made to a jury and that a reasonable jury might have accepted: that there were two distinct schemes, one to defraud GoldKist and one to defraud Pilgrim's Pride, so that any use of the mails in the latter did not support a finding of mail fraud in the former.[2]

Budden did not, however, avail himself of that opportunity. Instead, he pled guilty to a Count which clearly alleged a *single scheme* to defraud the operators of the Sumter facility, initially GoldKist and subsequently Pilgrim's Pride. *See* Count 1 ¶¶ 3-5 (referring collectively to Budden Company's contracts with and fraud against Pilgrim's Pride and GoldKist); Count 1 ¶¶ 7-8 (referring to landfill receipts and amounts charged to Pilgrim's Pride and GoldKist "[f]rom 2002 through 2007" without distinguishing between the victims or any temporal break); Count 2 ¶ 1 (incorporating and referring to paragraphs 2-8 of Count 1 "as setting forth *a scheme* and artifice to defraud") (emphasis added); Count 2 ¶ 2 (referring to "*the scheme*") (emphasis added); Dkt. No. 51 (Amended Plea agreement referring to "*a* scheme" and "*this* scheme") (emphasis added).

---

[2] A reasonable jury might just as well have found a single scheme with two victims given that Budden performed the *same* services for and committed the *same* fraud on operators of the *same* facility throughout the period referenced in the indictment. The only change in the "scheme" was the use of the mails which followed a change in ownership of the facility and corresponding change in the facility's bill-paying practices. The same legal effect would have followed if GoldKist had instituted a change in its bill-paying practices which required Budden Company to use the mails to obtain payment.

4

Thus, Budden's guilty plea establishes a critical fact (that there was a single scheme) which disposes of his threshold premise (that there were two distinct schemes). Further, as discussed below, it is well established that use of the mail even in the later stages of a scheme to defraud brings the entire scheme within the scope of 18 U.S.C. § 1341. It follows that forfeiture applies to the gross proceeds of the entire scheme, covering the years 2002 though 2007.

**Consistency with Case Law.** The effect of Budden's guilty plea (discussed above) is consistent with critical aspects of case law. This includes case law relating to what constitutes a single "scheme" for purposes of forfeiture and case law regarding when later or tangential use of the mail may support conviction under 18 U.S.C. § 1341.

**What Constitutes a "Scheme" for Purposes of Forfeiture.** A single scheme may have multiple victims. *See, e.g., United States v. Venturella*, 585 F.3d 1013, 1017-18 (7th Cir. 2009) (affirming forfeiture order for more than was obtained through the mailing referenced in the single count to which defendants pled guilty where indictment alleged a "scheme to defraud *various government agencies* [and where] each mailing was a separate act in furtherance of that scheme") (emphasis added). In *Venturella*, the court noted that the "government need not prove each instance of mail fraud in order to demonstrate that the defendants participated *in a fraudulent scheme*" and also that defendants had "pled guilty to one count of mail fraud *that also alleged a fraudulent scheme*." *Venturella*, 585 F.3d at 1017 (emphasis added).

As noted above, the scheme at issue in *Venturella* involved multiple government agencies. Thus, *Venturella* supports the proposition that a scheme may involve multiple victims. It also supports the proposition that, where the defendant pleds guilty to a single count which is part of a fraudulent scheme, forfeiture is not limited to that single count but should cover the entire scheme,

5

even where there are multiple victims. *See id.* at 1017 (also noting court had "interpreted other statutes authorizing forfeiture to include the total amount gained by the crime or criminal scheme, even for counts on which the defendant was acquitted"); *see also United States v. Boesen*, 473 F. Supp. 2d, 932, 952-53 (S.D. Iowa 2007) (noting a single scheme may be executed many times and approving forfeiture for "gross proceeds from the overall scheme charged in the indictment[,]" including for executions of the scheme which were not specifically charged).

This treatment of a scheme for purposes of forfeiture is also consistent with the definition of "common scheme or plan" under the Sentencing Guidelines:

> Common scheme or plan. For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by *at least one* common factor, such as common victims, common accomplices, common purpose or similar modus operandi.

Guidelines Manual § 1B1.3 ¶ 9(A) (defining common scheme or plan for purposes of determining relevant conduct) (emphasis in italics added).

The scheme to defraud alleged in Budden's superceding indictment had multiple common factors including two closely-linked, though distinct victims (consecutive owners and operators of the same facility), the same perpetrator acting through the same company, an identical (not just similar) purpose and modus operandi. Thus, assuming the evidence supported the indictment, a reasonable jury could have concluded that there was a single scheme to defraud.

**Effect of Later Use of the Mail.** The critical question, then, is whether the use of the mail only in the later part of the single scheme and with relation only to a later victim requires the court to disregard Budden's earlier gains in determining the amount of forfeiture. While the court has found no case on point, decisions on analogous issues support the conclusion that a later use of the

6

mails renders all profits from a single scheme subject to forfeiture. *See, e.g., United States v. Pierce*, 400 F.3d 176 (4th Cir. 2005) (holding requirement that United States mail be used in furtherance of the fraudulent scheme was satisfied by post-fraud mailing of false reports by third-party who was not a participant in the scheme to defraud where jury could have found those mailings lulled the victim into a false sense of security aiding in concealment of the fraud).

As explained by the dissent in *Pierce*, the United States Supreme Court has taken an expansive view of what mailings may support conviction under Section 1341. For example, a mailing made after the fraud is otherwise accomplished may suffice if it is "made for the purpose of lulling the victims into believing that the defendants would perform the promised services." *Pierce*, 400 F.3d at 184 (discussing *United States v. Sampson*, 371 U.S. 75 (1962)). A mailing may also suffice if made by an innocent third-party in a subsequent transaction which is the natural result of the scheme. *Id.* at 185 (discussing *Schmuck v. United States*, 489 U.S. 705 (1989) (holding innocent car dealer's later mailing of title documents to customers satisfied mailing requirement where defendant was charged with rolling back odometers before selling cars at inflated prices to innocent car dealers who then sold them to the ultimate customers).[3]

In this case, the mailing is more closely linked to the fraud than the mailings addressed in *Pierce*, *Sampson*, and *Schmuck* for two reasons. First, the mailing in this case was an integral part of continued execution of the fraudulent scheme, not merely a post-fraud mailing which lulled the victim into a false sense of security. Second, the mailing was by the perpetrator of the fraud, not by some innocent third party.

---

[3] The dissent in *Pierce* opined that, through its decision in *Pierce,* the Fourth Circuit had pushed beyond the outer limits of the Supreme Court's already expansive view of what constituted a mailing with sufficient connection to the fraud to support a conviction under Section 1341.

Moreover, following the reasoning in *Pierce*, a jury could have concluded that the later mailing to Pilgrim's Pride served to conceal the earlier fraud against GoldKist. This is because suspicions would have been raised if the Budden Company had declined to send any bill to Pilgrim's Pride once it learned that entity would not accept hand-delivered bills or make in-person payment. Those suspicions could have led to an investigation which would have uncovered the entire scheme, including the fraud against GoldKist. Thus, the later mailing of bills for services to Pilgrim's Pride may have served to some degree to conceal earlier fraud against a different victim within the same scheme.

The parties have not offered and the court has not found any case with circumstances similar to those here, a single scheme involving multiple victims, with the mails used solely as to a later victim. The court, nonetheless, concludes that the Supreme Court and Fourth Circuit's expansive view of what constitutes use of the mail in furtherance of a scheme to defraud would reach this conduct where the scheme is determined (or admitted by guilty plea) to be a single scheme.

## CONCLUSION

For the reasons set forth above, the court concludes that the amount of the forfeiture should equal the full amount gained through the scheme to defraud alleged in the Superceding Indictment. The court, therefore, orders forfeiture of $2,209,628.30.

IT IS SO ORDERED.

    s/ Cameron McGowan Currie
    CAMERON MCGOWAN CURRIE
    UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
April 17, 2012